COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO. 2-08-007-CR

 

 

JEWELL LYNN MADDEN                                                       APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








A jury
convicted Appellant Jewell Lynn Madden of four counts of aggravated sexual
assault of a child and three counts of indecency with a child by contact.  The jury found the enhancement allegations to
be true, and the trial court imposed concurrent life sentences for the
aggravated sexual assault counts and sixty‑year sentences for the
indecency counts, to be served consecutively to the sentences for the
aggravated sexual assaults but concurrently with each other.  Appellant brings three points on appeal,
arguing that the trial court erred by denying his motion for mistrial, by
admitting hearsay testimony, and by violating his constitutional double
jeopardy protections.  Because the trial
court committed no reversible error, we affirm the trial court=s
judgment.

                                         Hearsay Testimony





In his
second point, Appellant contends that the trial court erred by admitting out of
court statements that the complainant made to her physical education teacher,
Pauletha Amos.  Amos testified that the
complainant had told her that Appellant made her watch Aadult
movies with females doing nasty things to males and males doing nasty things to
females@ and
that he touched her private area and made her touch him.  The State offered the testimony not as an
outcry statement but as an excited utterance. 
Amos testified that other students told her that the complainant was
upset and that she had been crying.  Amos
called the complainant over to the side and asked her what was going on Abecause
she was not normal.@ 
Amos testified that the complainant was Aupset,
crying, rubbing her eyes.  And other kids
were around her comforting her.@  Amos testified that the complainant told her
that something bad had happened to her, so Amos told her to go into Amos=s
office.  They went into the office, and
the complainant began telling Amos that her mother=s
boyfriend had done Anasty things to her.@

An
excited utterance is an exception to the prohibition against hearsay evidence
and is A[a]
statement relating to a startling event or condition made while the declarant
was under the stress of excitement caused by the event or condition.@[2]  For a statement to qualify as an excited
utterance under rule of evidence 803(2), it must be the product of a startling
event, made while the declarant was dominated by the emotion, excitement, fear,
or pain of the event, and the statement must have related to the circumstances
of the startling event.[3]  It is well established that

 

[t]he basis for the
excited utterance exception is Aa psychological one, namely, the fact that when a
man is in the instant grip of violent emotion, excitement or pain, he
ordinarily loses the capacity for reflection necessary to the
fabrication of a falsehood and the >truth will come out.=@  In other words, the statement is trustworthy
because it represents an event speaking through the person rather than the
person speaking about the event.

 








In determining whether a
hearsay statement is admissible as an excited utterance, the court may consider
the time elapsed and whether the statement was in response to a question.[4]

 

In Hughes
v. State,[5]
our sister court in Tyler rejected the State=s
contentions that a complainant=s statements
produced as a result of an interview were excited utterances:

That some of a declarant=s statements were in
response to questions does not necessarily make them inadmissible under this
exception to the hearsay rule.  But it is
an important factor in determining the spontaneity of the statement.  [The Hughes court explained that both]
Deputy Wellborn and Ms. Baggerly asked C.D.H. [the complainant in Hughes]
questions calculated to elicit information about past events and
activities.  AResponses to this type of
questioning are normally considered reflective narratives of past events@ and hence lacking the
spontaneity required to be admissible under this exception.

 

 . . . [T]he rule requires a determination (1)
whether C.D.H.=s presence with Opal and
Deputy Wellborn at Opal=s interview was an
occurrence startling enough to produce a state of nervous excitement which
would render her statements made during two lengthy interrogations Aspontaneous and
unreflecting@ and, if so, (2) whether
the startling event continued to dominate the reflective powers of her mind
during that period.  Several
circumstances argue against it here.

 








C.D.H. was brought to the
Grapeland Police Department to lend moral support for her younger cousin Opal
while she talked to the investigators. 
Opal and C.D.H. had recently discussed their shared history as victims
of sexual abuse.  C.D.H. had assured Opal
that if she had to turn her father in, she would not be left to suffer alone.
She knew why she was going to be with Opal, and she knew what she was going to
hear.  It was undoubtedly stressful but
should not have been startling or surprising. 
The two interviews were conducted in tandem.  The length of the interviews is itself a
circumstance arguing against unreflecting spontaneity. The record indicates
that both girls remained in the room throughout the interviews by both Deputy
Wellborn and Ms. Baggerly.  The
investigators, in their testimony, did not recount unreflecting statements made
by the complainant.  Instead, they
summarized what they described as a very detailed narrative that emerged over a
protracted interrogation.

 

. . . . 

 

Responding to the
investigator=s questions, C.D.H.
narrated a painful personal history.  But
narrations, especially of this length, are inherently reflective, not
spontaneous.  As its name strongly
suggests, the exception for excited utterances or spontaneous declarations was
not developed to allow the introduction into evidence of extended narratives by
crime victims, and certainly not summaries of those narratives as in the
instant case. . . .

 

In this case, it is
impossible to conclude that C.D.H.=s statements were made without opportunity for
reflection or deliberation.  We decline
to further expand the excited utterance exception to include a summary
distilled from a protracted interrogation.[6]

 








In the
case before us, Amos took the complainant into her office sometime after
December 12, 2006, and began to question her. 
She asked her what was going on. 
She asked her Awhat was nasty going on with
her.@  The complainant recounted what she had seen
in the movies.  Then Amos asked her if
Jennifer Camp, the complainant=s
classroom teacher, knew.  The complainant
replied that she had already spoken to Camp. 
Then Amos asked the complainant if she had spoken with the counselor,
Wanda Campbell.  The complainant replied
that she had spoken with the counselor and that CPS was involved.

The
record shows that CPS had received a referral from the complainant=s
school, and the police received it on December 5, 2006.  Also on December 5, the complainant=s mother
went to the police department to discuss the accusation.  The following day, CPS personnel told
Appellant to move out of the house, and he left that day.  He never moved back in.

The
complainant also explained to Amos that she had gone to the doctor at Cook
Children=s
Hospital, that she had had to lie on a table, and that the doctor had had to go
between her legs.  The examination took
place on December 12, 2006.  Amos said,
in response to the prosecutor=s
question, that when the complainant was discussing the movies, she told Amos
that Appellant had made her do those nasty things to him when her mom was not
at home.  Amos said the complainant was
upset because her brothers were upset and because she could not tell anyone
about what had happenedCAppellant had told her that he
would hurt her and her family if she told.








The
circumstances in which the complainant told her story, as provided in the
record, in no way indicate that she had lost "the capacity for reflection
necessary to the fabrication of a falsehood."[7]  Indeed, Amos=s taking
the complainant into her office and asking her to explain what had occurred and
how she felt about it presupposes that the complainant would reflect on her
answers before speaking.

Additionally,
the record shows that Amos did not begin her separate interview with the
complainant until after the complainant had discussed the events with her
teacher, her counselor, representatives of CPS, and medical personnel at Cook
Children=s
Hospital; had been examined by a doctor; and had participated in a taped CPS
interview.

This was
a statement made about an upsetting series of events, but the statement was not
an excited utterance as contemplated by the rule.  The trial court erred by overruling Appellant=s
objection to the testimony.

The same
evidence, however, was admitted elsewhere. 
Both the complainant and the outcry witness, Camp, had testified in
detail about the same matters, rendering the error in improperly admitting the
hearsay testimony of Amos harmless.[8]  We overrule Appellant=s second
point.





                                         Denial
of Mistrial

In his
first point, Appellant complains that the trial court erred by denying his
motion for mistrial, infringing on his rights to due process and the
presumption of innocence.  After a police
officer had already testified without objection that Appellant had been
arrested, the State asked the complainant=s mother
if she had visited Appellant in jail. 
Appellant objected that evidence of incarceration was not relevant and
injected facts that had no probative value and that any probative value was
substantially outweighed by the prejudicial effect.  He also raised a rule 404(b) objection.

The
prosecutor immediately withdrew the question. 
The trial court sustained Appellant=s
objection and instructed the jury to disregard the question.  The trial court denied Appellant=s motion
for a mistrial.  On appeal, Appellant
argues that the prosecutor=s
informing the jury that Appellant had been incarcerated invades the presumption
of innocence, relying on Randle v. State.[9]  Appellant equates informing the jury of his
incarceration with forcing him to stand trial before the jury in jail clothes.





When the
trial court sustains an objection and instructs the jury to disregard but
denies a defendant=s motion for a mistrial, the
issue is whether the trial court abused its discretion by denying the mistrial.[10]  Only in extreme circumstances, when the
prejudice caused by the improper argument is incurable, that is, Aso
prejudicial that expenditure of further time and expense would be wasteful and
futile,@ will a
mistrial be required.[11]  In determining whether the trial court abused
its discretion in denying the mistrial, we balance three factors:  (1) the severity of the misconduct or
prejudicial effect, (2) curative measures, and (3) the certainty of conviction
absent the misconduct.[12]  The prosecutor immediately withdrew the
question.  The trial court took quick
action and sustained the objection and instructed the jury to disregard.  There is no indication in the record that the
trial court=s instruction to disregard was
ineffective.  The question was not so
prejudicial and inflammatory that the instruction could not cure the harm.  Additionally, as the State points out,
similar evidence was admitted elsewhere without objection.  We therefore hold that the trial court did
not err by overruling Appellant=s motion
for mistrial.  We overrule Appellant=s first
point.

                                         Double
Jeopardy







In his
third point, Appellant contends that his convictions for indecency violate his
right to be free from double jeopardy. 
Appellant points out that although a person who commits more than one
sexual assault against the same complainant may be convicted and punished for
each separate act, even if the acts were committed in close temporal proximity,[13]
the State may not engage in Astop-action@
prosecutions.[14]

The
question, then, is whether Appellant was prosecuted for seven distinct
offenses, or four offenses and three lesser included offenses of those same
offenses.  Relying on Ochoa v. State,[15]
in which the Texas Court of Criminal Appeals held that indecency with a child
can be a lesser included offense of aggravated sexual assault, depending on the
facts of the case, Appellant argues that the convictions for aggravated sexual
assault charged in counts one through four and the convictions for indecency
with a child by contact charged in counts five, six, and seven were based on
the same acts and thus violated double jeopardy protections.






To
determine whether both offenses are the same, we must examine the elements of
the applicable statutes to determine whether each statute Arequires
proof of an additional fact which the other does not.@[16]  When resolving whether two offenses are the
same for double jeopardy purposes, we focus on the elements alleged in the
charging instrument.[17]

The
indictment alleges that all the aggravated sexual assault counts occurred on or
about December 5, 2006, and that all the indecency counts occurred on or about
December 1, 2006.  The complainant
testified to repeated sexual acts against her and explained that they happened
almost every day that her mom went to work. 
She also testified that Appellant placed his penis in her mouth every
time he Amessed
with@
her.  She had to hold his penis with her
hand or hands while it was in her mouth. 
The complainant testified that Appellant penetrated her female sexual
organ with his finger and touched her genitals and anus with his penis.  He continued to sexually assault her until
the day before CPS came to her house.

Although
Camp and Amos mentioned touching, they were indefinite about what Appellant
touched the complainant with and reported only that he had touched her private
area.






The
indecency offenses and the aggravated sexual assaults occurred over a long
period of time on multiple days, but there is no evidence beyond speculation
that Appellant committed separate and distinct offenses of indecency.  The State has provided us a helpful chart,
which we reproduce below: 




 
 
  
 Count 1C 
 Aggravated Sexual Assault
 
 
  
 C.G. testified that
 Appellant ordered her to open her legs and then put his penis in her private
 part.  RR 4:26.  This hurt C.G. very badly.  RR 4:27. 
 C.G. testified that Appellant told her to check to see if she was
 bleeding . . . .  RR 4:27.  C.G. told [Crystal Utley, the nurse
 practitioner who examined her at Cook Children's Hospital]  that Appellant=s penis contacted her
 vagina.  RR 5:78.
 
 
 
 
  
 Count 2C 
 Aggravated Sexual Assault
 
 
  
 Once Appellant
 determined that she was not bleeding, Appellant ordered C.G. to flip over and
 lay on her stomach again.  RR
 4:27.  Appellant stood up and placed
 his penis on her behind.  RR 4:28.  Appellant would place his penis on her
 bottom and in her privates.  RR
 4:31.  C.G. testified that this made
 her private burn when she urinated.  RR
 4:31.
 
 
 
 
  
 Count 3C 
 Aggravated Sexual Assault
 
 
  
 C.G. told Amos that
 Appellant was making her watch pornographic movies and that Appellant made
 her do those nasty things to [him] when her mom was not home.  RR 4:87. 
 Appellant would touch her in her private area and made C.G. touch him
 on his privates.  RR 4:88.
 
 
 
 
  
 Count 4C 
 Aggravated Sexual Assault
 
 
  
 C.G. testified that
 Appellant placed his penis in C.G.=s mouth and pushed her head back and
 forth.  RR 4:25B26.  C.G. also testified that Appellant put his
 penis in her mouth and Apeed@ in her mouth.  RR 4:30. 
 C.G. swallowed it one time and her stomach began to hurt.  RR 4:30B31.
 
 
 
 
  
 Count 5C 
 Indecency with a Child
 
 
  
 Camp testified that
 C.G. told her that Appellant would touch her down thereCwhich Camp took to mean
 in a sexual manner.  RR 4:69B70.  C.G. testified that in addition to
 Appellant placing his penis in her privates, Appellant would insert his
 finger in her privates.  RR 4:38B39.
 
 
 
 
  
 Count 6C 
 Indecency with a Child
 
 
  
 C.G. testified that
 Appellant would touch her in her behind. 
 RR 4:37.
 
 
 
 
  
 Count 7C 
 Indecency with a Child
 
 
  
 C.G. testified that she
 would hold Appellant=s penis.  RR 4:38. 
 C.G. testified that A(w)henever he put it in (my) mouth, he told me
 I have to hold it.@  RR 4:38. 
 C.G. said that she would hold it with her hands.  RR 4:38.
 
 




 








We hold
that the evidence does not show that the four aggravated sexual assault
offenses alleged in the indictment are totally separate and apart from the
three indecency by contact charges alleged in the indictment.  The question arises, then, whether the State
may plead the lesser included offenses when the evidence shows repeated
commission of the greater offenses. 
Although the evidence shows only the greater offenses, occurring
repeatedly, the greater offenses were described by the complainant in detail
that included the lesser offenses of indecency. 
Based on our review of the record, we hold that the record sufficiently
describes more than seven separate and discrete events during which Appellant
sexually assaulted the complainant.  We
also recognize that nothing in the statutes governing indictments prevents the
State from indicting a person for a lesser offense than one supported by the
proof.[18]  Finally, we hold that because the evidence
reflects more than seven instances of aggravated sexual assault that included
the elements of the lesser offense of indecency, there was no double jeopardy
violation.[19]  We therefore overrule Appellant=s third
point.

                                             Conclusion

Having
overruled Appellant=s three points, we affirm the
trial court=s judgment.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL: 
CAYCE, C.J.; LIVINGSTON and DAUPHINOT, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: 
September 3, 2009











[1]See Tex. R. App. P. 47.4.





[2]Tex. R. Evid. 803(2).





[3]McFarland v. State, 845 S.W.2d 824, 846
(Tex. Crim. App. 1992), cert. denied, 508 U.S. 963 (1993).





[4]Zuliani v. State, 97 S.W.3d 589, 595B96 (Tex. Crim. App. 2003)
(citations omitted).





[5]128 S.W.3d 247 (Tex. App.CTyler 2003, pet. ref=d).





[6]Id. at 253B54.





[7]McFarland, 845 S.W.2d at 846.





[8]See Leday v. State, 983 S.W.2d 713, 718
(Tex. Crim. App. 1998); Johnson v. State, 803 S.W.2d 272, 291
(Tex. Crim. App. 1990), cert. denied, 501 U.S. 1259 (1991), overruled
on other grounds by Heitman v. State, 815 S.W.2d 681 (Tex. Crim. App.
1991); see also Brooks v. State, 990 S.W.2d 278, 287 (Tex. Crim.
App.), cert. denied, 528 U.S. 956 (1999); Harris v. State, 133
S.W.3d 760, 772B73 (Tex. App.CTexarkana 2004, pet. ref=d).





[9]826 S.W.2d 943, 945 (Tex.
Crim. App. 1992).





[10]Hawkins v. State, 135 S.W.3d 72, 77 (Tex.
Crim. App. 2004).





[11]Id.; see also Simpson v.
State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), cert. denied, 542
U.S. 905 (2004).





[12]Hawkins, 135 S.W.3d at 77; Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied,
526 U.S. 1070 (1999).





[13]Vick v. State, 991 S.W.2d 830, 833
(Tex. Crim. App. 1999).





[14]Patterson v. State, 152 S.W.3d 88, 92 (Tex.
Crim. App. 2004).





[15]982 S.W.2d 904, 908 (Tex.
Crim. App. 1998).





[16]Blockburger v. United
States,
284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932); see United States v. Dixon,
509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993); Parrish v. State, 869
S.W.2d 352, 353B55 (Tex. Crim. App.
1994).





[17]Bigon v. State, 252 S.W.3d 360, 370
(Tex. Crim. App. 2008).





[18]See Tex. Code Crim. Proc.
Ann. art. 21.01B.31 (Vernon 2009).





[19]See Medcalf v. State, No. 02-07-00366-CR,
2008 WL 4926025, at *2B3 (Tex. App.CFort Worth Nov. 13, 2008,
pet. ref=d) (mem. op., not
designated for publication); Bottenfield v. State, 77 S.W.3d 349, 358
(Tex. App.CFort Worth 2002, pet. ref=d), cert. denied,
539 U.S. 916 (2003); Hutchins v. State, 992 S.W.2d 629, 633 (Tex. App.CAustin 1999, pet. ref=d, untimely filed).